[Civ. No. 12477.  Second Dist., Div. One.—June 30, 1941.]

DENIS H. GRADY et al., Respondents, v. JAMES I. EASLEY et al., Appellants.

Jensen & Jensen and William C. Jensen for Appellants.

Grady & Hotchkiss and Harold K. Hotchkiss for Respondents.

YORK, P. J.—This is an appeal from a summary judgment made August 2, 1939, against appellants Easley under section 437c of the Code of Civil Procedure for the sum of $2416.33 and costs, it being contended (1) that the affidavits of respondents filed in connection with their motion for summary judgment are insufficient to support such judgment; (2) that appellants' affidavit filed in opposition to said motion is sufficient to entitle them to defend or present a triable issue of fact, and that the entry of the summary judgment improperly deprived them of their constitutional right to a jury trial.

Section 437c of the Code of Civil Procedure, at the time the judgment herein was entered, provided as follows: " . . . when an answer is filed . . . if it is claimed that there is no

defense to the action, on motion of plaintiff . . . supported by affidavit of any person or persons having knowledge of the facts, the answer may be stricken out and judgment may be entered, in the discretion of the court, unless the defendant by affidavit or affidavits shall show such facts as may be deemed by the judge hearing the motion sufficient to entitle him to defend. . . . *The affidavit or affidavits in support of the motion must contain facts sufficient to entitle plaintiff to a judgment in the action and the facts stated therein shall be within the personal knowledge of the affiant, and shall be set forth with particularity, and each affidavit shall show affirmatively that affiant , . . can testify competently thereto.* The affidavit or affidavits in opposition to said motion shall be made by the defendant or by any other person having knowledge of the facts and together shall set forth facts showing that the party has a good and substantial defense to the plaintiff's action upon the merits. The facts stated in each affidavit shall be within the personal knowledge of the affiant, and shall be set forth with particularity and each affidavit shall show affirmatively that the affiant . . . can testify competently thereto. *When the party resisting the motion appears in a representative capacity, such as trustee, guardian, executor, administrator, or receiver, then the affidavit in opposition by such representative may be made upon his information and belief.*" (Emphasis added.)

Respondents, as trustees under the will of Emily B. Garner, deceased, brought the instant action to recover on a promissory note executed by appellants in favor of decedent for the sum of $2500, payable on October 15, 1936. The amended answer to the complaint sets up separate defenses as follows: (1) want of jurisdiction in the superior court over the subject of the action; (2) lack of consideration for the execution of the note; and (3) that the note was obtained from appellants through the fraud, deception and misrepresentations of decedent Garner and her agents, servants and employees in connection with a transaction whereby decedent obtained from appellants their ranch in New Mexico for her citrus grove located at La Habra, California. In addition, said amended answer sets up a counterclaim for the sum of $950, money had and received by decedent, her successors and assigns, for the use of appellants.

According to the allegations of the answer, the fraud complained of consisted of false representations to the effect that

the California ranch was situated in a locality that was frost-less; that the cost of watering the orchard thereon was be-tween $300 and $400 per year; that the indebtedness on the well which supplied the water was $5,000; that the operation of the ranch property would produce a gross revenue of $8,000 to $10,000 per year; that the fruit trees on the property were all in first-class condition. Further, that decedent, her agents, servants and employees concealed from appellants the fact that the water level in the well supplying the water to the orchard had fallen over 100 feet in the ten years preceding the exchange of properties, and she falsely represented to appellants that the cost of operation of said property includ-ing all expenses was $3500 per year. Appellants then alleged that instead of a $5,000 loan on the well, there was a $16,000 loan against it; that the cost of water necessary to operate the ranch was in excess of $1,000 per year; that over six acres of orange trees had been improperly planted, that the trees were stunted and had to be removed; that it was impossible to operate the property for less than $4700 per year; that the first year after the exchange was made more than one-half of the crop was destroyed by frost and all the avocado trees on the property were permanently damaged.

The motion for summary judgment was made upon the ground that the answer is spurious in that "(a) Where both parties to an exchange have an opportunity to investigate, neither can rely on alleged misstatements to avoid the con-tract; (b) Where water stock is sold with property any rep-resentation in connection with water supply is an expression of opinion and not a representation of fact; (c) The conduct of defendants in paying interest and principal for three years and obtaining extension of time constitute a waiver of any alleged fraud; (d) Similarly defendants' failure to file a claim against the Estate of Emily B. Garner is indicative of waiver"; and also on the further ground that the first and third affirmative defenses do not state sufficient facts to con-stitute a defense.

The affidavit of respondent Grady avers that from January, 1931, to the date of her death on February 4, 1936, he was retained as counsel, financial and business adviser by Mrs. Emily B. Garner; that he was executor of her will and that he and his co-plaintiff Hollenbeak are trustees of her estate, and as such are owners and holders of the note here sued upon.

That in August of 1934, Mrs. Garner, who owned a 23-acre orange grove at La Habra, California, discovered through an advertisement that appellants had a ranch in New Mexico for sale or trade; that she contacted them and they came to La Habra where they remained for several days inspecting the orange grove and investigating the operation, income and water conditions prevailing thereupon. That they indicated their willingness to make "the deal", whereupon Mrs. Garner went to New Mexico to inspect the Easley property. That on August 28, 1934, at Albuquerque, Mrs. Garner and the Easleys executed a contract of exchange, herein referred to as Exhibit "A". A short time thereafter, appellant James I. Easley visited the office of affiant and it was agreed that Exhibit "A" should be amended, and on September 28, 1934, another agreement, herein referred to as Exhibit "B", was executed which incorporated the said amendments, it having first been examined by appellants' attorney. At their first conference affiant and appellants discussed the provisions of Exhibit "A" which required a $5,000 payment to be made by Mrs. Garner on a mortgage against the La Habra property, and the repayment of same to her by appellants, it being indicated that the Easleys were pressed for cash. Said appellants agreed that they would repay the $5,000, as provided in Exhibit "A", by a cash payment of $2500 into escrow and by executing a note for $2500 in favor of Mrs. Garner, due in two years with interest at 6%, said cash and note to be delivered to Mrs. Garner at the close of the escrow. This $2500 note is the note here sued upon and is referred to in the record as Exhibit "C". Before the escrow was completed on November 15, 1934, both parties had taken possession of the respective properties under the exchange agreement, and 54 shares of stock in the Grandview Mutual Water Company were transferred to appellants.

According to his affidavit, when appellants first came to the office of respondent Grady in September of 1934, which was prior to the time the properties were placed in escrow, he discussed with them "the trade generally, but not specifically with reference to any items such as the indebtedness of the Grandview Mutual Water Company", and explained to appellants that "the president of the water company would be able to give them any information they desired, pertaining to the water supply or condition of the wells"; affiant also explained to them that the La Habra Citrus Association had a

contract for the purchase of all citrus fruit from said ranch and that inquiry could be made to said association for information regarding production, etc., of the La Habra ranch; that neither affiant nor Mrs. Garner was well versed with respect to the management of the ranch for the reason that during the time Mrs. Garner owned it she had had someone else manage it for her. That for a period of over ninety days before the transfer or exchange of properties was completed, the Easleys communicated with him upon several occasions, during most of which time they were in possession of the said orange grove, and neither then nor since did the Easleys make any complaint about any misrepresentations having been made to them by this affiant, by Mrs. Garner or by anyone purporting to represent her.

Affiant avers that during the years 1935, 1936 and 1937 he corresponded with the Easleys regarding the note and at all times the Easleys indicated their willingness to pay the same and thanked him for his "kind patience". That on October 15, 1937, he received a letter enclosing a check for $650 to be applied $500 to the principal and $150 to the interest then due on the note, said letter reciting: "We want to thank you sincerely for your leniency and consideration in this matter and to assure you that we will further reduce the note at the earliest possible moment."

Quoting from the affidavit: "Affiant states that never at any time since the transfer of said properties has the said James I. Easley, or his wife, Marguerite B. Easley, indicated by any word or action that they were dissatisfied with the real estate deal or that any misrepresentation had ever been made to them, because had they done so at a time when it would have been possible this affiant would have made every effort to have re-traded the properties back, as affiant felt in the beginning and feels now that said Emily B. Garner was not benefited at all by the trade of said properties . . . that this is indicated by the fact that said Easleys have been and now are asking $75,000 for the La Habra property, which has about $22,000 against it, while affiant did for years endeavor to sell the said (New Mexico) property for $21,000 with a land purchase contract against it of approximately $1.600 . . . (which) was finally traded for some property in La Jolla, California."

Respondent Grady then states upon information and belief that at no time since the fall of 1934 had the appellants complained to the Beckwiths or to Mrs. Garner "about anything connected with the trade of said properties, nor have they complained in any way about the orange ranch at La Habra."

The affidavit then goes on to state that the "Easleys had better sources of information than from this affiant and that affiant would have shown them the water bills, tax bills, etc., which had been paid on the La Habra ranch during the period that the said Emily B. Garner was the owner thereof had he been asked to do so and affiant states that the said Easleys did not inquire of affiant concerning such matters but did of their own accord go to the president of the Grandview Mutual Water Company and to the La Habra Citrus Association for their information."

Many other facts are averred in said affidavit based on information and belief to the effect that appellants were on friendly terms with Mrs. Garner and her relatives, including her brother, Mr. Beckwith, as well as with affiant, and therefore had ample means at their disposal to have ascertained those facts which they now claim were either concealed from them or were misrepresented to them.

The affidavit of James I. Easley in opposition to the motion for summary judgment is to the following effect: That all negotiations culminating in the execution of the agreement of August 28, 1934 (Exhibit "A"), were had between him and one Captain Beckwith and a real estate agent with whom said Beckwith had listed the La Habra property; that Beckwith is the surviving brother of Mrs. Emily B. Garner and held himself out as the owner of said property and affiant did not know that Mrs. Garner was the owner thereof until just prior to the execution of said agreement, when Beckwith informed affiant in the presence of Mrs. Garner that said "property was not carried in his name for reasons which he would thereafter explain, but that he had had full and complete charge of it and the final say-so."

That "prior to the execution of said agreement, the said Captain Beckwith and said real estate agent told affiant that the cost of watering the alleged orchard upon said property was between $300 and $400 per year; that the indebtedness on the well which supplied the water to said property was $5,000.00; that the operation of the property would produce

a gross revenue of $8,000 to $10,000 a year; that the fruit trees upon said property were all in first-class condition and said Emily B. Garner, her agents, servants and employees, concealed from defendants the fact that the water level in said well had fallen over one hundred feet in the ten years preceding said exchange, and represented to defendants that the cost to operate said property, including all expenses, was $3500.00 a year. Affiant alleges that each and all of said statements were false and untrue; that affiant believed said statements and relied upon same and would not otherwise have made said exchange, and was wholly unfamiliar with conditions in California or with raising citrus, all of which was at said time fully known to said Beckwith and to said Emily B. Garner.'' Affiant then avers as his best recollection of the matter that some of these conversations took place in the presence of Mrs. Garner, and ''that all of said matters, including the representations made by said Beckwith and said real estate agent, and defendants' entire unfamiliarity with conditions in California or the citrus industry were heard by Mrs. Emily B. Garner during the period of said negotiations and prior to the execution of said agreement, and said Emily B. Garner at no time objected thereto or indicated to this affiant in any way that said representations were not made with her approval.'' That affiant never met respondent Grady until after the execution of the agreement of August 28, 1934; that about a month after that date he ''received information that said Grady, as attorney for Mrs. Garner and said Beckwith, threatened to file a suit to cancel the whole deal, unless said agreement should be amended. It is affiant's best recollection that at this time possession had actually changed hands and affiant had gone to a lot of expense, and rather than be faced with a lawsuit, he did, by reason of the said threats, execute the agreement of September 28, 1934. . . . Affiants had no discussion whatsoever with said Denis Grady, or did they even know him or of him until after the execution of said agreement of August 28, 1934. At no time prior to the completion of the escrow which was some time after the agreement of September 28, 1934, did affiants have any conversation with said Grady with reference to any matter pertaining to said transaction except the one matter hereinbefore referred to, to-wit: That said Grady did advise his clients to cancel the whole deal unless defendants would consent to the cancel-

lation of paragraph VIII of said agreement of August 28, 1934. Subsequently thereto, however, affiant has many times informed Grady of each and all of the representations made to them by said Beckwith and said real estate agent, as shown in defendants' answer, and of the fact that all of said representations were untrue, to which said Grady has replied, 'Well, I tried to keep the deal from going through.' The said Beckwith took over the operation of said New Mexico ranch and at said time it was in excellent condition, well stocked and complete in every detail. Said Beckwith soon tired of the property, however, and allowed it to deteriorate . . . (and) later traded said property for property in La Jolla, and they advertised that said property at La Jolla had cost them $75,000 but that they would take $40,000 in cash. For several years after the completion of said transaction affiant and said Beckwith freely conversed with reference to the same, and the said Beckwith boasted to affiant and also to many friends of affiant, that the defendants 'Wanted a lemon ranch and they sure got one.' To another friend of affiants' he stated, 'Well, I guess I am going to have that California place back on my hands. I have a $45,000 mortgage on it which is more than it is worth.' Defendants became destitute of funds and had no money to even pay the taxes on the property or all of the interest upon the first and second trust deeds thereon, and communicated many times their troubles to said Beckwith and also informed him of the fact that they would never be able to pay said note. Said Beckwith later appeared to defendants to become remorseful because of the plight of defendants and of his part therein. He told defendants that everything he had was tied up in the trust and that said Grady was the trustee . . . that said Grady was dishonest and was dealing with said property for his own purposes and was robbing the estate, and that he was going to have Grady removed as trustee after which, if defendants could hang on a little longer, he would make things right with defendants and help them out of their financial plight. . . . to try to placate Grady until he could get matters again in his own hands and he (Beckwith) specifically advised affiant to make the payments on said note, which affiant made, if there was any possible way that affiant could raise the money. It was by reason of these matters that affiant made the payments on said notes as shown in the pleadings. It was also for these reasons that affiant never took any action seeking affirmative

relief. Affiant at all times fully believed that it was within the power and ability of said Beckwith to assist him in his difficulties and to obtain the surrender and cancellation of said note.''

While "Ordinarily, the only question presented upon an appeal from a summary judgment under section 437c is whether or not the trial court abused its discretion'' (*Kelly* v. *Liddicoat,* 35 Cal. App. (2d) 559, 560 [96 Pac. (2d) 186], citing *Bank of America etc. Assn.* v. *Oil Well Supply Co.,* 12 Cal. App. (2d) 265 [55 Pac. (2d) 885]; nevertheless, "The validity of the judgment is to be determined by the sufficiency of the affidavits considered upon the hearing of the motion.'' (*McComsey* v. *Leaf,* 36 Cal. App. (2d) 132, 133 [97 Pac. (2d) 242].) After an exhaustive review of the subject, the opinion in the last named case of *McComsey* v. *Leaf,* announces the following rule at page 140 thereof: "to warrant a summary judgment, there 'must be a failure on the part of defendant to satisfy the court that there is any basis for his denial or any truth in his defense' (Cardozo in *Curry* v. *Mackenzie,* 239 N. Y. 267 [146 N. E. 375], and unless the defendant does so fail, the case shall proceed to a deliberate trial in the usual course. (*Krieger* v. *Dennie,* 123 Cal. App. (Supp.) 777 [10 Pac. (2d) 820].)''

"It may be conceded at the outset that on a motion for summary judgment the allegations of fact made by defendants in their affidavits must be accepted as true, and that the primary question for the court to decide is whether the affidavits, when so viewed, raise an issue of fact. If an issue of fact is raised, then a summary judgment is improper, and the case must proceed to trial. (*Krieger* v. *Dennie,* 123 Cal. App. (Supp.) 777, 780 [10 Pac. (2d) 820].) If, however, the facts as averred are accepted and create only an issue of law, the court is bound, under the provisions of section 437c, to render a judgment on motion.'' (*Bank of America etc. Assn.* v. *Casady,* 15 Cal. App. (2d) 163, 168 [59 Pac. (2d) 444].)

In the case of *Wyatt* v. *Madden,* 32 Fed. (2d) 838 [59 App. D. C. 38], cited and relied upon in *McComsey* v. *Leaf, supra,* suit was brought by plaintiff to recover on two promissory notes. The defendant in her answering affidavit to the motion for summary judgment averred that she was induced to

execute and deliver to plaintiff said notes in reliance upon certain material representations made by plaintiff's agent; that the said representations were false; that they were made with intent to deceive, and that by reason thereof she was damaged in a sum considerably in excess of the amount of her notes to the plaintiff.

In said case it was held at page 839 of the opinion: "The enforcement of rule 73 (relating to summary judgment) deprives a defendant of a trial on the merits. Therefore, we have ruled that plaintiff's affidavit must be strictly construed. *St. Clair* v. *Conlon*, 12 App. D. C. 161, 163; *Riley* v. *Mattingly*, 42 App. D. C. 290, 294. An affidavit of defense, on the contrary, is to be liberally construed, and, if its terms reasonably warrant the inference that the defendant has a substantial defense to plaintiff's claim, summary judgment ought not to be entered. *Codington* v. *Standard Bank*, 40 App. D. C. 409; *Lawman* v. *Johnston*, 42 App. D. C. 202. In the light of these decisions, we are of the opinion that the court erred in entering summary judgment in this case.

"Plaintiff's suit is based upon defendant's default in payment of notes. Defendant alleges, in effect, that she was induced to execute these notes through material misrepresentations, known to be false, and made for the purpose of inducing action on her part. By moving for judgment, plaintiff admits every material averment in the affidavit of defense.

"One who has been induced to enter into a contract by false and fraudulent representations may rescind the contract; or he may affirm it, keeping what he has received under it, and maintain an action to recover damages he has sustained by reason of the fraud; or he may set up such damages as a complete or partial defense if sued on the contract by the other party. (13 C. J. 395; 12 R. C. L. p. 408, sec. 154; *Passaic National Bank* v. *Commercial National Bank*, 262 Fed. 234 [49 App. D. C. 146].)

"The materiality of the alleged false statements can best be determined by a trial on the merits. In *Shappirio* v. *Goldberg*, 192 U. S. 232, 241 (24 S. Ct. 259, 261, 48 L. Ed. 419), the court observed that: 'There are cases where misrepresentations are made which deceive the purchaser, in which it is no defense to say that had the plaintiff declined to believe the representations and investigated for himself

he would not have been deceived.' Whether this statement applies to the present case will depend upon the facts disclosed by the evidence.''

In the light of the foregoing authorities, taking into consideration the circumstances presented by the record herein, it is the opinion of this court that the materiality of the alleged fraudulent statements should be determined by a trial on the merits of the case.

The judgment is reversed, and the cause remanded for trial.

Doran, J., and White, J., concurred.

Respondents' petition for a hearing by the Supreme Court was denied August 28, 1941.